# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## COUK & DUNCAN v. SKEEN, JUDGE.

### December 3, 1908.

1. CONSTITUTIONAL LAW— *Statutes — Emergency — Dispensing with Reading—Sections 50 and 53 of · Constitution.*—The emergency which makes it necessary for a law to *take effect* sooner than ninety days after the adjournment of the legislature is entirely different from the emergency which must exist in order to dispense with *reading the bill* on three different calendar days in each house. The first is provided for by section 53 of the Constitution, and by its express terms the emergency must be expressed in the body of the bill. The second is provided for by section 50 of the Constitution, and the emergency need not be expressed in the bill. This is also the legislative construction of these constitutional provisions.

2. CONSTITUTIONAL LAW—*Sufficiency of Title of Statute.*—If the subjects embraced in an act, but not specified in the title, have congruity or natural connection with the subject stated in the title, or are cognate and germane thereto, the requirement of the Constitution that "no law shall embrace more than one subject, which shall be expressed in its title," is satisfied.

3. CONSTITUTIONAL LAW—*Title of Statute—"Court-house"—"County Seat."*—The word *"court-house"* is used in ·this State as synonymous with *"county seat,"* and the title of the act which uses one term is sufficient to cover the body of an act using the other.

4. CONSTITUTIONAL LAW—*Sinking Fund for County Bonds—Section 187 of Constitution Applicable to State Only.*—Section 187 of the Constitution of this State providing that "every law hereafter enacted by the General Assembly creating a debt or authorizing a loan shall provide for the creation and maintenance of a sinking fund for the payment and redemption of the same" refers only to a debt contracted by, or a loan made to, the State, and not to bonds issued by a county for the purpose of erecting a court-house. Moreover, section 834d of the Code of 1904 enacted prior to the act called in question in this controversy, and in *pari materia,* authorizing the boards of supervisors of the several counties, under certain conditions, to borrow money and issue

bonds therefor whenever necessary to build a court-house, provides that when the bonds of a county are so issued, the board of supervisors shall levy a tax sufficient to pay the interest thereon and create a sinking fund to pay the principal at or before maturity.

Original application for a writ of prohibition.

*Writ Denied.*

The opinion states the case.

*R. L. Pennington, C. F. Duncan, B. H. Sewell, James W. Orr* and *Irvine & Morison,* for the petitioners.

*R. E. L. Chumbley, J. C. Noell* and *Bullitt & Kelly,* for the respondent.

Cardwell, J., delivered the opinion of the court.

The object of this proceeding is to prohibit the respondent, as judge of the Circuit Court of Lee county, from issuing any order calling a special election in the county of Lee on the question of the removal of the court-house of said county from Jonesville to Pennington Gap, in said county, pursuant to the prayer of certain petitions presented to the respondent, as authorized by the act of the General Assembly approved March 14, 1908 (Acts 1908, p. 594), entitled, "An act to provide for submitting the question of the removal of the court-house of any county to the qualified voters of such county, and in the event such removal is voted, to authorize the board of supervisors to acquire necessary land and erect buildings."

Section 50 of the Constitution, with respect to the enactment of laws, requires, *inter alia,* that every bill shall be read at length on three different calendar days in each house, etc., but this requirement may be dispensed with, "*in any case of emergency by a vote of four-fifths of the members voting in each house taken by the yeas and nays, the names of the members*

*voting for and against* entered on the journal''; and section 53 of the Constitution, relating to the "time when laws take effect," is as follows: "No law, except a general appropriation law, shall take effect until at least ninety days after the adjournment of the session of the General Assembly at which it is enacted, unless in case of an emergency (which emergency shall be expressed in the body of the bill), the General Assembly shall otherwise direct by a vote of four-fifths of the members voting in each house, such vote to be taken by the yeas and nays, and the names of the members voting for and against entered on the journal."

The act of the legislature, *supra,* was plainly intended to meet by a general law the requirement of section 63 of the Constitution, that "the General Assembly shall not enact any local, special or private law" in certain named cases, among which is "changing or locating county seats."

The first ground upon which petitioners rely is that the act is unconstitutional in that it did not pass the Senate in the manner required by section 50 of the Constitution. To sustain this contention the Senate Journal for the session of 1908 is vouched, and it there appears in the recorded proceedings of March 6, 1908, that the bill in question—House Bill No. 88— came before the Senate on its second reading, and that on motion to dispense with the reading of the bill, as required by section 50 of the Constitution, the Senate being of opinion that an emergency existed, the required reading was dispensed with by the vote of 21 ayes to 2 noes; and that on a further motion the bill was then passed by its title, the vote being 28 ayes and 4 noes.

The exact point urged by petitioners is that this was not an emergency bill, and it was not, therefore, competent for the Senate to suspend the reading of the bill as required by section 50 of the Constitution; in other words, that as the act, which was enrolled and signed by the presiding officers of the two houses and approved by the Governor, does not declare an

emergency in the body of the act, it was not constitutionally enacted and is void. This contention is rested upon the provisions of section 53 of the Constitution, *supra.*

Section 53 relates to the time when a law shall take effect, and it is therein provided that no law, except a general appropriation law, shall take effect until at least ninety days after the adjournment of the General Assembly, unless in case of emergency, which emergency shall be expressed in the body of the bill. Clearly the emergency therein indicated is not the kind of emergency referred to in section 50, and could not have reference to the class of bills to which belongs the one here contested. An emergency which makes it necessary for a law *to take effect* sooner than ninety days after the adjournment of the General Assembly, and which emergency must be expressed in the body of the bill, is a very different kind of an emergency from that referred to in section 50. There might be quite a number of emergencies which might arise, making it necessary to dispense with the reading of the bill on three different calendar days, although there was no need whatever for the act when passed to take effect sooner than ninety days after the adjournment of the General Assembly. Again, there might be a number of bills on the calendar of one or both houses at the approaching end of the legislative session, the passage of which was absolutely essential to the welfare of the State, but if they had to be read on three different calendar days could not be passed.

The legislature of the State has full power to legislate on any subject and to adopt its own rules, regulations and methods of enacting such legislation, unless prohibited by the Constitution; and the fact that the Constitutional Convention expressly declared that the kind of an emergency which might make it necessary for a bill to take effect sooner than ninety days after the adjournment of the General Assembly should be expressed in the body of the bill, and did not require that the kind of an emergency referred to in section 50 should be so expressed,

very clearly indicates that it was not the intention of the convention to require that the latter kind of an emergency should be so set forth or declared. It is not claimed that this is expressly required, and there is no reason whatever to resort to implication.

To require such an emergency as is referred to in section 50 to be expressed in the body of the bill might defeat the very purpose of that section altogether. Where it is necessary for an act to take effect sooner than ninety days after the adjournment of the General Assembly, this can be foreseen at the time the bill is drafted, and there would be no hardship in requiring the fact to be set forth in the body of the bill; but the kind of an emergency referred to in section 50 cannot be seen until it arises, and then to insert it in the bill (which could only be done by amendment) would require the bill to be sent back to the other house for adoption or rejection, and in many cases would result in a failure to pass the bill.

The right of the public is safeguarded by the requirement of section 50, that in case of an emergency, such as there referred to, the reading of the bill on three different calendar days may be dispensed with only by a vote of four-fifths of the members voting taken by the yeas and nays, and the names of the members voting for and against entered on the journal.

The construction of section 50 that we have indicated is the same that the legislature has itself given it. The journals of both the Senate and the House show that a great number of bills have been passed since the adoption of the present Constitution in the same manner that the bill here in question was passed by the Senate, and in none of them that we have been able to examine is such an emergency as is referred to in section 50 of the Constitution expressed in the body of the act, while in all designed to take effect sooner than ninety days after the adjournment of the General Assembly the emergency is expressed in the body of the act.

The next ground relied on by petitioners is that the act in question violates section 52 of the Constitution, which provides that no law shall embrace more than one subject, which shall be expressed in its title.

Section 52 of the present Constitution is identical with section 15 of the former Constitution, and in the case of *Ingles* v. *Straus,* 91 Va. 209, 21 S. E. 490, practically the same question here presented was considered and determined. It was there held that if the subjects embraced in the act, but not specified in the title, have congruity or natural connection with the subject stated in the title, or are cognate or germane thereto, the requirement of the Constitution, that " no law shall embrace more than one subject, which shall be expressed in its title," is satisfied.

We deem it only necessary to say that we are of opinion that the case cited controls this case upon the point under consideration.

It is further contended that the act in question is unconstitutional because its title is for taking a vote on the question of the removal of the *court-house* and not the *county seat;* in other words, that *court-house* means one thing and *county seat* another.

In Virginia; as in some of the other States, the two terms are used as synonymous. Says Webster's International Dictionary, "The word *court-house in Virginia* is used as synonymous with county seat." See also *Shanewerk* v. *Hoberecht,* 117 Mo. 22, 22 S. W. 949, 38 Am. St. Rep. 631; 2 Words and Phrases, 1683.

The title to the act assailed on constitutional grounds in *Ingles* v. *Straus, supra,* as in this case, used the term court-house alone and not county seat, and there, as here, throughout the body of the act, the legislature sometimes used the term court-house and sometimes the term county seat, and clearly used them as having the same meaning. It is true that in that

case the question here under consideration was not raised, and doubtless the learned and astute counsel seeking to have the act in the former case declared unconstitutional took the view that as a matter of common knowledge the term court-house, *in Virginia,* is used as synonymous with county seat.

The remaining contention in this case is that the act in question is unconstitutional because it "gives authority to the board of supervisors to create a debt and to obtain a loan by issuing county bonds, and yet it does not provide any way whatever for the creation and maintenance of a sinking fund for the payment and redemption of the same."

Section 187 of the Constitution does provide, that "Every law hereafter enacted by the General Assembly creating a debt or authorizing a loan shall provide for the creation and maintenance of a sinking fund for the payment and redemption of the same"; but plainly that provision refers only to a debt contracted by the State, or to a loan made to the State, and is not at all applicable to a case like this where the statute merely provides that if a majority of the freeholders of a county voting on the question be in favor of a change of the location of their court-house, and if the land needed shall not be donated and the fund offered be not sufficient to acquire the land and erect the necessary buildings, or if the land shall be donated and the fund offered be not sufficient for the purpose, the board of supervisors shall have authority to issue the bonds of the county, etc., etc. Moreover, section 834d of the Code of 1904, enacted prior to the act here in question and *in pari materia,* authorizing the boards of supervisors of the several counties, under certain conditions and wherever necessary, to erect a court-house, clerk's office, or jail, etc., to borrow money and to issue bonds therefor, provides that when the bonds of a county are so issued, "the board of supervisors shall levy upon all property and lawful subjects of taxation for State purposes in said county a sum and tax sufficient to pay the interest on

said bonds, and in such manner as they may deem best create a sinking fund sufficient to pay the said bonds at or before maturity."

We are of opinion that upon none of the grounds relied on by petitioners in this case should the writ of prohibition prayed be awarded, and it is, therefore, denied.

*Writ Denied.*